UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

98 DEC -3 PM 5: 00

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

LAWLER MANUFACTURING CO., INC.,      )
                                     )
                  Plaintiff,         )
                                     )
v.                                   )          CAUSE NO. _____
                                     )
BRADLEY CORPORATION AND KEVIN B.     )
KLINE,                               )
                                     )
                  Defendants.        )

I P98-1660 C - M/S

## COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

For its Complaint against Defendants Bradley Corporation ("Bradley") and Kevin B.

Kline ("Kline"), Plaintiff Lawler Manufacturing Co., Inc. ("Lawler") alleges as follows:

### Allegations Common to All Counts

### Parties and Jurisdiction

1.     Lawler is an Indiana corporation, having its principal place of business in

Indianapolis, Indiana.

2.   Bradley is a Wisconsin corporation, having its principal place of business in

Menomonee Falls, Wisconsin.

3.     Kline is an individual presently employed by Bradley, as well as being a former

director, shareholder, officer and employee of Lawler.  Kline continues to this day to be a

shareholder of Lawler.  Kline is believed to presently reside in or around Whitefish Bay,

Wisconsin.

386151.3

/.

4. This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. §1331 because this action gives rise to a federal question, by virtue of 28 U.S.C. §1338 because certain claims of Lawler arise under the patent and unfair competition laws of the United States, by virtue of 28 U.S.C. §1332 because this is a controversy between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, by virtue of 28 U.S.C. §§2201 and 2202 because Lawler requests this Court to declare the rights of the parties herein, and by virtue of 28 U.S.C. §1367 because of certain claims asserted by Lawler herein are so related to the federal claims that they form part of the same controversy.

5. Venue is proper in this judicial district by virtue of 28 U.S.C. § 1391 because a substantial part of the events giving rise to Lawler's claims occurred in this district.

<u>The History of the Parties</u>

6. Plaintiff Lawler and Defendant Bradley are competitors in the sale of thermostatic mixing systems intended for emergency applications.

7. Kline was first employed by Lawler in or about July of 1988, and was continuously employed by Lawler until he left Lawler in February, 1997.

8. In or around 1988 and in conjunction with another individual, Steve Gregory ("Gregory"), Kline entered into an agreement to purchase Lawler.

9. Robert Eveleigh ("Eveleigh") acquired a majority interest in Lawler in or about 1988 and is presently its President. Thereafter, Eveleigh owned a majority of the stock with Kline and Gregory each owning minority interests.

10.   Upon coming into its own existence in 1988, Lawler neither made nor sold any thermostatic mixing valves intended for emergency applications.

11.   In or about September, 1996, Gregory left Lawler and thereafter sold his shares to Eveleigh.  Accordingly, while at one time being one of three initial shareholders of Lawler, Kline is presently one of only two shareholders of closely held Lawler.

12.   During his employment by Lawler, Kline was also an officer, director and shareholder of Lawler.  Kline held the position of Vice President upon his leaving Lawler.

13.   Kline continues to be a shareholder of Lawler and has been such a shareholder continuously since prior to his departure from Lawler.  Presently, Kline owns ten percent (10%) of Lawler's outstanding shares.

14.   Throughout the entire time period during which Kline was an officer, director, shareholder and employee of Lawler, Lawler was, and is presently, a closely held corporation.

### The History of Thermostatic Mixing Valves

15.   In or about 1991, Lawler was approached by The Hawes Drinking Faucet Company (Hawes), the largest manufacturer and seller of emergency shower drench equipment in the United States at that time, to design a system to mix hot and cold water to produce "tempered" water.  Tempered water is achieved by controlling and maintaining within a predetermined range the outlet flow temperature over a wide range of inflow conditions, i.e., temperature and flow rates of the incoming hot and cold water.

16.   Tempered water is essential in emergency shower and eyewash systems to ensure that such systems are operable and deliver a safe water temperature whenever needed in a chemical or industrial emergency when it may be necessary to place a person beneath a deluge

shower or utilize an eyewash to flush or rinse away harmful chemicals or other liquid or solid

contaminants that come in contact with the person or his or her clothing.

17.   In such emergency applications, it is essential that flushing and rinsing water be

available through such shower and eyewash systems regardless of the inflow conditions of the

primary water supply, while assuring that the user is not subjected to scalding water

temperature, which could increase the severity of any injury.

18.   In or about early 1996, it became publicly known that a new national standard for

emergency eyewash and shower equipment was being considered for approval by the American

National Standards Institute (ANSI).

19.   An ANSI Standard implies a consensus of those substantially concerned with its

scope and provisions, and is intended as a guide to aid the manufacturer, the consumer, and the

general public.  The existence of an ANSI Standard does not preclude anyone from

manufacturing, selling or using product, processes or procedures that do not conform to the

standard.

20.   Bradley had actual knowledge of the initial proposal to revise the ANSI Standard

for emergency eyewash shower equipment because Bradley was a member of a group of

organizations that was contacted and allowed to review the proposed ANSI Standard prior to its

approval.

21.   At the time Bradley became aware of the proposed ANSI Standard, Bradley did

not manufacture thermostatic mixing valves.

22.   At the time the new ANSI Standard was formally proposed, Lawler was already

manufacturing and selling its Model No. 911 emergency thermostatic mixing valve that

complied with the standard eventually approved by ANSI on April 16, 1998, as ANSI Z358.1-1998 (revision of ANSI Z358.1-1990).

23.   Well before the ANSI Standard was even proposed in or about early 1996, Lawler was developing thermostatic mixing valve technology.  Indeed, Lawler is the owner by assignment of U.S. Patent No. 5,011,074, issued April 30, 1991, titled THERMOSTATIC MIXING VALVE WITH THERMOSTAT FAILURE COMPENSATION, hereinafter referred to as "the '074 Patent."

24.   Lawler is also the owner by assignment of U.S. Patent No. 5,203,496, issued April 20, 1993, titled THERMOSTATIC CONTROL VALVE WITH FLUID MIXING, hereinafter referred to as "the '496 Patent."

25.   Lawler is also the owner by assignment of U.S. Patent No. 5,323,960, issued June 28, 1994, titled THERMOSTATIC CONTROL VALVE WITH FLUID MIXING AND NON-LINEAR RESPONSE CHARACTERISTICS, hereinafter referred to as "the '960 Patent."

26.   Lawler is also the owner by assignment of U.S. Patent No. 5,379,936, issued January 10, 1995, titled FLOW CONTROL VALVE ASSEMBLY, hereinafter referred to as "the '936 Patent."

27.   Lawler is also the owner by assignment of U.S. Patent No. 5,647,531, issued July 15, 1997, titled THERMOSTATIC CONTROL VALVE SYSTEM FOR USE IN EMERGENCY SHOWER AND EYEWASH SYSTEMS, hereinafter referred to as "the '531 Patent."  Copies of the cover pages of the '074, '496, '960, '936 and '531 patents are attached

collectively as Exhibit A.  (The '074, '496, '960, '936 and '531 patents are sometimes

hereinafter referred to collectively as simply "the Lawler Patents" for convenience.)

28.   Defendant Kline is a named co-inventor in the '531 Patent, and the named sole

inventor in the '496, '074, '960 and '936 Patents.

29.   In the fall of 1989 and again in the spring of 1995, discussions were had between

Lawler and Bradley regarding Bradley's potential purchase of Lawler.  During these

discussions, certain confidential and proprietary information of Lawler was discussed with

Bradley pursuant to the protections of confidential disclosure agreements that prohibited

Bradley from using any of this information to the detriment of Lawler.  None of those

discussions was successful.

30.   Upon information and belief, in early 1996 when Bradley realized that the new

ANSI Standard was proposed and that it had no product that would meet the new standard in its

likely final form, that it had no thermostatic mixing valves for that matter intended for

emergency applications, and that its attempts to acquire Lawler had failed, Bradley initiated

plans to misappropriate Lawler's thermostatic mixing valve technology by hiring away Kline,

the sole or joint inventor in each of the Lawler Patents,  and utilizing Lawler's confidential and

proprietary information and technologies in violation of the confidentiality agreements executed

between Bradley and Lawler.

31.   Upon information and belief, sometime prior to November 27, 1996, while still

an officer, director, shareholder and employee of Lawler, Kline was involved in negotiations

with Bradley regarding his potential employment with Bradley in such a capacity that would

allow Bradley to compete with Lawler in the sale of products employing thermostatic mixing valves intended for emergency applications.

32.   Upon information and belief, Bradley pursued Kline to design thermostatic valves that Bradley intended to use in the assembly of its emergency shower and eyewash systems for a certain period of time prior to Bradley's entering the thermostatic mixing valve market directly.

33.   Upon information and belief, shortly after Kline's employment negotiations with Bradley had begun, Kline began making preparations to leave Lawler and join Bradley.

34.   Indeed, in October of 1996, Kline contacted Michael D. Beck, Esq., ("Beck") a patent attorney who handled the preparation and prosecution of the Lawler Patents, regarding certain patents that Lawler then held and asked Beck to provide Kline with copies of those patents.   Kline represented to Beck that he was involved in some sort of dispute with Lawler and needed copies of the Lawler Patents "to update his portfolio."   Beck complied and provided Kline with the requested patent copies.   Upon information and belief, Kline promptly forwarded to Bradley those copies of the Lawler Patents in conjunction with his employment negotiations with Bradley.

35.   Bradley then offered Kline the position as Senior Valve Engineer in or about November, 1996.

36.   The priority responsibility for Kline at Bradley was and is to develop a line of thermostatic product valves.

37.   In late 1996, upon information and belief, while Kline was negotiating with Bradley regarding potential his employment by Bradley, Kline intentionally sabotaged the

development of certain products by Lawler and otherwise took steps to impede Lawler's progress so as to benefit Bradley, his future employer, and to damage Lawler.  At a minimum, Kline negligently performed certain of his duties for Lawler as an officer, director, shareholder, and employee of Lawler while he was at the same time negotiating his potential employment with Bradley.

38.    In or about late 1996 or early 1997, Kline announced he was leaving Lawler and had accepted a position with Bradley.

39.    Kline's personal office was located immediately adjacent to the engineering room where Lawler's technical drawings and blueprints were kept, many of which constitute and reflect Lawler's confidential and proprietary information and technology.

40.    In late 1996 or early 1997, Kline was also observed by a Lawler employee loading approximately 10 to 15 boxes of documents into his personal van in the parking lot of Lawler in the evening after the work day had ended.  Kline was also observed in his office at Lawler that evening loading documents and materials into several additional boxes.

41.    Upon information and belief, the number of file boxes Kline was observed loading into his personal vehicle and packing in his office in late 1996 or early 1997 were far more than were necessary to contain his personal belongings from his office.

42.    Prior to his leaving Lawler in February, 1997, Kline communicated regularly with Lawler customers and potential customers and, upon information and belief, indicated he was leaving Lawler and joining Bradley to the detriment of Lawler and to the benefit of Bradley.

43.   On or about February 14, 1997, which was a Friday, Kline tendered his letter of resignation to Lawler from its Board of Directors.  Kline's last day of employment at Lawler was also that same day (February 14, 1997).

44.   On or about February 17, 1997, the following Monday, Kline began his employment with Bradley.

45.   Prior to his leaving Lawler, Kline indicated to another fellow employee of Lawler's, Tim Kinney ("Kinney"), that in Kline's new job with Bradley, Bradley would pay Kline a $150,000.00 bonus if he could "put Lawler out of business."

46.   Surrounding his resignation from Lawler, Kline stated to a fellow employee of Lawler's, Lupae Keys ("Keys"), that Kline intended to design his own version of Lawler's Model No. 911 emergency valve in his new employment with Bradley.  (The Model No. 911 emergency valve is patented and described collectively in one or more of the Lawler Patents.)

47.   On or about Kline's last day at Lawler, Kline further indicated to Keys that Kline did not care if he took business away from Lawler in his new position at Bradley.

48.   Upon information and belief, prior to his leaving Lawler and while he continued to be a director, officer, shareholder and employee of Lawler, Kline conceived ideas, concepts and designs for thermostatic mixing valves intended to avoid the Lawler Patents.

49.    Upon information and belief, prior to his leaving Lawler and while he continued to be a director, officer, shareholder and employee of Lawler, Kline conceived ideas, concepts and designs for thermostatic mixing valves intended to avoid the Lawler Patents and provided Bradley with those ideas, concepts and designs to enhance his bargaining leverage in his employment negotiations with Bradley.

50.   Upon information and belief, prior to his leaving Lawler and while he continued to be a director, officer, shareholder and employee of Lawler, Kline conceived ideas, concepts and designs for thermostatic mixing valves intended to avoid the Lawler Patents and represented to Bradley that he could design a thermostatic mixing valve(s) that would avoid the Lawler Patents to enhance his bargaining leverage in his employment negotiations with Bradley.

51.   Kline engaged in pre-resignation conduct that demonstrates disloyalty, and a breach of trust and lack of candor.  During all of these activities, Kline was an officer, director, employee and shareholder of Lawler.

52.   Bradley was put on notice that Lawler was concerned regarding its patented thermostatic mixing valve technology and Bradley's hiring of Kline by letter dated February 28, 1997, a copy of which is attached as Exhibit B.

53.   On or about March 1, 1997, Kline visited Lawler's facility in Indianapolis, Indiana, and met with Eveleigh, President of Lawler.  Kline indicated to Eveleigh that Bradley wanted to purchase Lawler's Valve Model No. 911 for inclusion in Bradley's emergency shower and eyewash systems.  Eveleigh responded that since Bradley was not a current Lawler customer, he would provide Bradley with Lawler's then-current standard pricing information for its emergency thermostatic mixing valves.  Kline responded that Eveleigh would have to do better than that, in terms of giving Bradley a better price, or Kline would have to "design a new emergency valve for Bradley."  Kline concluded the conversation with Eveleigh on that date stating that designing an emergency valve to compete directly with Lawler's patented valve (Model No. 911) would be Kline's top priority at Bradley.

54.   Upon information and belief, Bradley hired Kline to misappropriate Lawler's mixing valve technology and to, among things, design and develop a thermostatic mixing valve for emergency applications in direct competition with Lawler's thermostatic mixing valve technology and Model No. 911 valve covered by the Lawler Patents.  Attached as Exhibit C are copies of selected materials illustrating Lawler's Model No. 911 valve.

55.   Bradley's thermostatic mixing valve have been and are presently being made and sold including under the product Model Nos. S19-2000, S19-2100 and S19-2200 (hereinafter referred to as the "accused products").  Attached as Exhibit D are copies of selected Bradley materials promoting, as well as installation and maintenance instructions, for these accused products.

56.   One of Bradley's accused models bears the designation "Patent Pending."

57.   Based on information and belief, the technology(ies) that is the subject of the U.S. patent application(s) covering the Bradley accused model is identical to, the equivalent of, or was improperly derived from, ideas, concepts or designs Kline conceived or developed prior to his leaving Lawler.

58.   All such ideas, concepts or designs for any products of any kind whatsoever conceived or developed by Kline prior to his leaving Lawler belong in their entirety to Lawler.

59.   Based on information and belief, Bradley is not the rightful owner of any patent application(s) covering the accused products or any of the technologies, designs or concepts embodied in the accused products.

60.   During the time period Kline was an officer, director, shareholder and employee of Lawler, confidential and proprietary information relating to the products, technology, and

386151.3                                          11

business affairs of Lawler was routinely entrusted to Kline.  Kline had full and free access to such information.  Kline had personally developed and originated some of the confidential and proprietary information relating to the products, technology and business affairs of Lawler's, and then used that same information in performing his duties as an officer, director, shareholder and employee of Lawler.

61.   Information and materials furnished to and accessed by Kline during his employment by and management of Lawler included trade secrets and confidential and proprietary information of Lawler's, developed over a long period of time, and possessing independent economic value from being not generally known and not being readily ascertainable by proper means by other persons, including Defendant Bradley.

62.   Kline had actual knowledge of each of the Lawler Patents since each of their respective dates of issuance.

63.   During the week of October 26, 1998, at a show of the American Society of Plumbing Engineers (ASPE) held in Indianapolis, Indiana, Bradley and its representatives displayed emergency shower systems incorporating the accused products to existing and potential customers.

64.   The foregoing facts and circumstances shown present and justifiable controversy between the parties in need of resolution by this Court as to be ownership of the technology designs and attendant intellectual property rights relating to Bradley's accused products.

Count I

Breach of Fiduciary Duty
and Inducement to Breach Fiduciary Duty

65.   Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if they were fully set forth here.

66.   During the entire period that he was an employee, director and officer of Lawler and because he continues to be a shareholder of closely held Lawler, Kline has stood and continues to stand in a fiduciary relationship to closely held Lawler.  Accordingly, Kline has owed and continues to owe Lawler a fiduciary duty.

67.   Kline has breached and is continuing to breach the fiduciary duty owed by him to Lawler by his actions as set forth in paragraphs 1-64 above.

68.   Bradley had and continues to have full knowledge of Kline's fiduciary relationship and position with Lawler and, indeed, intentionally exploited that relationship and knowledge to its benefit and to the detriment of Lawler.  Thus, Bradley intentionally induced Kline to breach the fiduciary duty Kline owed and continues to owe to Lawler.

69.   Lawler has been damaged as a result of the breach by Kline and the inducement of breach by Bradley of Kline's fiduciary duty and will be irreparably harmed if this breach is allowed to continue.

70.   Kline's and Bradley's conduct constitutes malicious, fraudulent, grossly negligent and oppressive behavior in blatant disregard of Lawler's rights, for which Lawler should receive punitive damages in an amount that serves to punish Kline and Bradley and deter others from similar conduct in the future.

386151.3                                         13

## Count II

## Trade Secret Misappropriation

71.   Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if they were fully set forth here.

72.   During his employment with Lawler and as an officer, director and shareholder of Lawler, Kline had access to, learned and acquired Lawler's highly confidential and proprietary information including but not limited to Lawler's annual business and strategic plans, sales reports and strategies, pricing margin and profitability information, material pricing and distribution costs, new product development, technology, personnel information and production, planning and scheduling, all of which is hereinafter collectively referred to as the "Trade Secrets" of Lawler.

73.   During his employment and continuously until his leaving Lawler, Kline had ready and continuous access to Lawler's Trade Secrets and plans for new product development, including that of Lawler's new Model No. 911 thermostatic mixing valve.

74.   Lawler does not intentionally disclose any of its Trade Secrets to its competitors. Lawler treats its Trade Secrets as confidential company secrets and takes reasonable precautions to protect same from disclosure to outside parties.

75.   These Trade Secrets of Lawler have independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who could obtain economic value from them.

76.   It is virtually impossible for Kline to hold the position he holds with Bradley, which includes the same research and design duties and responsibilities that he held at Lawler, without inevitably using or disclosing some or all of Lawler's Trade Secrets.

77.   If Kline is permitted to work for Bradley in any position involving the design and development of thermostatic mixing valves, he will inevitably rely upon and use Lawler's Trade Secrets to the immediate and irreparable harm of Lawler.

78.   Lawler's Trade Secrets have actual or potential independent economic value.

79.   Lawler's Trade Secrets are not generally known to the public or to the thermostatic mixing valve industry in general.

80.   Lawler's Trade Secrets are not readily ascertainable by proper means by other persons who can obtain economic value from their disclosure.

81.   Lawler has developed its Trade Secrets over many years at great expense to and for the exclusive benefit of Lawler.

82.   Lawler has taken reasonable steps under the circumstances to maintain the secrecy of its Trade Secrets.

83.   Lawler's Trade Secrets constitute valuable business assets of Lawler.

84.   Lawler's Trade Secrets constitute "trade secrets" as defined under the Indiana Uniform Trade Secret Act, I.C. §24-2-3-1 et. seq.

85.   Kline's employment with Bradley in a position involving the research and development of thermostatic mixing valves will inevitably lead and has lead to the use and/or disclosure of Lawler's Trade Secrets and, therefore, is a threatened and actual misappropriation of Lawler's Trade Secrets.

86.   Bradley's and Kline's actions demonstrate untrustworthiness and lack of candor.

87.   Unless restrained, the conduct of Bradley and Kline will continue to be a threatened and actual misappropriation of the Trade Secrets of Lawler.

88.   Bradley and Kline have violated and are continuing to violate the Indiana Uniform Trade Secrets Act.

89.   The actual or threatened misappropriation of Lawler's trade secrets by Bradley and Kline has resulted in actual damages to Lawler and unjust enrichment to Bradley and Kline.

90.   Bradley has willfully misappropriated the Trade Secrets of Lawler.

91.   Kline has willfully misappropriated the Trade Secrets of Lawler.

92.   Bradley and Kline have caused and are continuing to cause Lawler actual and potential loss of business opportunities, loss or potential loss of good will in the thermostatic mixing control valve industry, loss of work hours and production of executives and other employees in order to investigate and begin to rectify the acts and conduct of Bradley and Kline, and loss due to legal expenses and costs, including attorneys' fees, and will continue to do so unless they are restrained.

93.   Bradley's and Kline's actual or threatened misappropriation of Lawler's Trade Secrets has caused and will continue to cause other immediate, substantial and irreparable harm to Lawler, for which there is no adequate remedy at law.

94.   Bradley's and Kline's conduct constitutes malicious, fraudulent, grossly negligent and oppressive behavior in blatant disregard of Lawler's rights for which Lawler should receive punitive damages in an amount that will serve to punish Bradley and Kline and deter others from similar conduct in the future.

## Count III

## Diversion of Corporate Opportunities

95.   Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if they were fully set forth here.

96.   By such conduct, Kline diverted to himself and/or Bradley corporate opportunities that belonged to Lawler while Kline was an employee, officer, director and shareholder of Lawler.

97.   Lawler has been damaged by this diversion.

## Count IV

## Conversion

98.   Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if they were fully set forth here.

99.   Kline and Bradley have knowingly or intentionally exerted unauthorized control over Lawler's property including, but not limited to, Lawler's Trade Secrets and thermostatic mixing valve technology.

100.  By doing so, Kline and Bradley have committed criminal conversion as defined in Indiana Code § 35-43-4-3.

101.  Lawler has been and will continue to be damaged by this conversion.

102.  The conversion of Lawler's Trade Secrets and thermostatic mixing valve technology has caused and will continue to cause immediate, substantial and irreparable harm to Lawler, for which there is no adequate remedy at law.

103.  Under Indiana Code § 34-4-30-1, the conversion of Lawler's Trade Secrets and thermostatic mixing valve technology makes Kline and Bradley liable to Lawler for the following:

(a)  treble damages;

(b)  costs of this action;

(c)  reasonable attorneys' fees;

(d)  actual travel expenses;

(e)  a reasonable amount to compensate Lawler for the time spent prosecuting this action; and

(f)  all other reasonable costs of collection.

104.  The conversion of Lawler's Trade Secrets and thermostatic mixing valve technology constitutes malicious, fraudulent, grossly negligent and oppressive behavior in blatant disregard of Lawler's rights for which Lawler should recover punitive damages in an amount that will serve to punish Kline and Bradley and deter others from similar conduct in the future.

<u>Count V</u>

<u>Negligence</u>

105.  Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if they were fully set forth here.

106.  As an officer, director, shareholder and employee of closely held Lawler, Kline owed and continues to owe Lawler a duty to exercise reasonable care in the discharge of his obligations.

107.  Kline breached his duty to exercise reasonable care on behalf of Lawler.

108. Kline's breach of this duty has caused Lawler damages.

Count VI

Unjust Enrichment

109. Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if they were fully set forth here.

110. Kline and Bradley obtained and continue to enjoy a benefit through the use of the Trade Secrets and other confidential and proprietary information gained from Lawler.

111. Kline and Bradley have been unjustly enriched by the use of same.

112. Lawler is entitled to compensation for the use of its Trade Secrets and other confidential and proprietary information.

113. Lawler has performed all conditions precedent necessary for recovery.

Count VII

Federal Unfair Competition

114. Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1 - 64 as if they were fully set forth here.

115. Bradleys' misappropriation of Lawler's Trade Secrets, technologies and designs relating to thermostatic mixing valves and the use thereof in connection with the accused products is a false designation of origin, or a false description or representation, and wrongfully and falsely designates the origin of Lawler's thermostatic mixing valve technology as originating from or being connected with Bradley, and amounts to utilizing a false description or representation in commerce.

116. Bradley's said acts are in violation of the federal Lanham Act (15 U.S.C. §1125).

## Count VIII

### Common Law Unfair Competition

117. Lawler realleges and incorporates by reference the allegations set forth in paragraphs 1- 64 as if they were fully set forth here.

118. This count arises under the common law of the United States and of Indiana, and in addition to the aforesaid bases of jurisdiction, the Court has pendant jurisdiction of same.

119. By its aforesaid conduct, Bradley has taken and is misappropriating the valuable goodwill so carefully and diligently created by Lawler.  Bradley's conduct is likely to cause confusion, or mistake or to deceive, and is likely to mislead the public to suppose that the accused products embody technology attributable to Bradley when in fact said technology belongs to Lawler.

120. By virtue of Bradley's acts, Bradley has been and is engaging in unfair trade practices and unfair competition against Lawler to Lawler's irreparable damage.

**WHEREFORE,** Lawler respectfully requests:

    (a)    For a declaration that the domestic and foreign patent application(s) presently own by or filed on behalf of Bradley and all technology(ies), designs and intellectual property rights attendant thereto, whether patentable or not, directed to incorporating or in any way related to Bradley's accused products are the property of Lawler and shall be transferred by Bradley to Lawler.

    (b)    Issuance of a preliminary and permanent injunction enjoining and restraining defendants Bradley and Kline, their agents and employees and

all persons and organizations in direct or active concert therewith, from:
(1) misappropriating Lawler's Trade Secrets, thermostatic mixing valve
technology and other confidential and proprietary information in any way;
(2) from creating, developing or designing thermostatic mixing valves
based on technology(ies), designs or concepts developed, conceived or in
anyway originated by Kline while he was employed by Lawler through
February 14, 1997, and indefinitely while Kline remains a shareholder in
closely held Lawler; (3) unfairly competing with Lawler; and (4)
permitting Kline from working for Bradley in a position involving the
research and development of thermostatic mixing valves for blending hot
and cold water intended for emergency applications to compete directly
with Lawler's patented valve lines.

(c)    That Bradley and Kline each be ordered to file with the Court and serve
on Lawler within thirty (30) days after service of the injunction a report in
writing under oath setting forth in detail the manner and form in which
each as complied with the injunction in accordance with 15 U.S.C. §1116.

(d)    Compensatory damages in a sum to be determined at trial.

(e)    Treble and threefold damages, where applicable.

(f)    Profits made by Bradley due to its misappropriation of the Trade Secrets,
thermostatic mixing valve technologies and other confidential and

proprietary information of Lawler, and its unfair trade practices against Lawler.

(g)   Costs and expenses of prosecuting this suit and reasonable attorneys' fees.

(h)   Punitive damages, where applicable.

(i)   Interest on the award, costs, fees and other charges to the maximum extent permissible, including pre-judgment interest.

(j)   That Bradley be required to deliver up to be impounded or destroyed by the Court during the pendency of this action all finished and unfinished inventory of the accused products and all parts and components therefor in accordance with 15 U.S.C. §1118.

(k)   Such other and further relief as the Court may deem just and reasonable.

Respectfully submitted,

_____
Daniel L. Boots, Atty. No. 11879-06

_____
Daniel T. Hackman, Atty. No. 17355-49
Attorneys for Plaintiff
Lawler Manufacturing Co., Inc.

BINGHAM SUMMERS WELSH & SPILMAN
2700 Market Tower
10 West Market Street
Indianapolis, IN  46204
(317) 635-8900

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been served this 3rd day of December, 1998, by Overnight Delivery, upon:

Mr. James E. Carroll
President/Chief Operating Officer
Bradley Corporation
W142 N9101 Fountain Boulevard
Menomonee Falls, WI 53052-0309

Mr. Kevin B. Kline
800 E Henry Clay Street, Apt. 101
Whitefish Bay, WI 53217